UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

ABRAHAM PETTWAY,                                              Plaintiff,

v.                                          Civil Action No. 3:17-cv-73-DJH-CHL

LOGISTICS SOLUTIONS GROUP, INC. et
al.,                                                        Defendants.

* * * * *

## MEMORANDUM OPINION AND ORDER

Plaintiff Abraham Pettway alleges that Defendant Logistics Solutions Group, Inc. discriminated against him on the bases of age, race, sex, and perceived disability in violation of state and federal law. (Docket No. 20, PageID # 212-19) He also alleges that LSG retaliated against him for making complaints to his employer and to the Equal Opportunity Commission, and for filing a complaint in this matter. (*Id.*, PageID # 219-221) Finally, Pettway asserts claims under Kentucky common law, alleging outrageous conduct and negligent supervision. (*Id.*, PageID # 222-24) LSG moves for summary judgment on all of Pettway's claims. (D.N. 40-1) After careful consideration and for the reasons set out below, LSG's motion for summary judgment will be granted in part and denied in part.

## I.

The following description of the factual background is atypically long. The Court finds it necessary to outline the facts in significant detail given that the discovery record provided by the parties is disordered.

LSG—a subcontractor to Logistics and Technology Services, Inc.—provides logistical services to government clients at the U.S. Army's Fort Knox post in Kentucky. (D.N. 40-2, PageID # 397; D.N. 40-10, PageID # 667) Pettway, an 81-year-old African American man, has

been employed as a civilian bus dispatcher at Fort Knox since June 1, 2001, and is the most senior dispatcher at the Fort Knox Transportation Motor Pool location. (D.N. 41-1, PageID # 723) Pettway was an employee of the prior subcontractor until LSG began providing support services at Fort Knox on February 15, 2015. (D.N. 40-2, PageID # 398) At that time, Pettway became an employee of LSG. (*Id.*)

Pettway worked under the supervision of Donnell Scott, a white woman, from 2010 until Scott left LSG in 2017. (D.N. 41, PageID # 703) Pettway testified that Scott began discriminating against him in 2013. (D.N. 40-5, PageID # 466) Specifically, Pettway says that in 2013, he overheard Scott telling Kelly Denson—a white dispatcher—that she was "going to put [Pettway] on nights and put him back so the less [she] s[aw] of him . . . the better." (*Id.*) Between February 2013 and September 2013, Pettway was moved from the 4:30 a.m. to 12:00 p.m. shift to the 3:00 p.m. to 12:00 a.m. shift.[1] (*Id.*, PageID # 466-67)

Pettway testified that after returning from vacation on August 9, 2016, he was told that Kathy Wheeler—a younger white female employee with no dispatch experience—would assign the buses. (*Id.*, PageID # 453) In his declaration, Pettway stated that prior to that point, he had

---

[1] Pettway's claims cover the time period from 2015 to 2017. (D.N. 20, PageID # 199-211) But, the factual record created by the parties addresses the preceding period involving the same employees. In his amended complaint, Pettway noted that Akima was his prior employer from 2012 until LSG assumed in the contract in 2015. (*Id.*, PageID # 200) Pettway's claims against Akima were addressed in a prior opinion. (*See* D.N. 36) When LSG assumed the contract, it hired most of the prior contractor's employees. (D.N. 40-2, PageID # 397) Scott confirmed in her deposition that new contractors "hire the incumbent" and that she was kept in her supervisor position when LSG assumed the contract in 2015. (D.N. 40-4, PageID # 419-20) By discussing the prior history between Scott and Pettway, the Court does not rest its conclusions on facts from a time period not in dispute except as to the discrete issue of determining whether Scott had the scienter necessary to impute her alleged discriminatory animus to Gonsalves, the decisionmaker, under a "cat's paw" theory of liability. *See infra* Part II(B)(1)(i)(A) at page 18.

always assigned buses to drivers for their runs. [2] (D.N. 41-1, PageID # 724)  Despite the fact that Wheeler had the sole authority to assign buses, Pettway made changes to Wheeler's bus schedules on two occasions.  (D.N. 36-2, PageID # 453)  In his declaration, Pettway says that Scott did not tell not him that he was going to receive a written counseling or warning after the first such incident. (D.N. 41-1, PageID # 724)  Instead, Scott explained the need for rotating the buses.  (*Id.*)  Pettway again made a change to the schedule on September 27, 2016, after he and another employee could not find the bus-assignment sheet.  (*Id.*)  Pettway testified that he assigned buses without the schedule to avoid being in trouble.  (D.N. 40-5, PageID # 449)

On September 30, 2016, Pettway received a written warning—otherwise known as an "employee counseling report"—for key log errors and for failure to follow the September 27 bus schedule.  (D.N. 41, PageID # 707)  Specifically, Pettway's write-up stated:

> On September 27, 2016[,] you assigned the day schedule buses and did not assign[] all the buses correctly.  The supervisor spoke with you two different times about the same mistake.  The last time the supervisor explained that if you did not follow the direction given you would receive a written/counseling/warning . . . . Insubordination will not be tolerated.
> . . . .
>
> Dispatch is one of the most important sections of TMP.  It is your job to secure the building, gates, and keys every night . . . . It has been brought to my attention several times that you are not signing keys back in on the [form].  Other dispatchers are signing your name to keep the records in compliance.  I put a stop to this once I found out.  I ask the other dispatchers if they see a mistake like this to bring it to my attention . . . .  Occurrences of this type of behavior violate[] LSG rules and

---

[2] The submitted record shows that Pettway was deposed (D.N. 40-5), yet he also submitted a declaration (D.N. 40-6).  Sixth Circuit precedent "prevents a party from submitting a new affidavit [or declaration] to manufacture a factual dispute by contradicting . . . earlier testimony."  *Webb v. United States*, 789 F.3d 647, 660-61 (6th Cir. 2015).  But, not every post-deposition affidavit or declaration is prohibited.  If the affidavit or declaration directly contradicts prior sworn testimony, the Court may still consider that evidence if the party opposing summary judgment provides a persuasive justification for the contradiction.  *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006).  If there is no direct contradiction, "then the district court should not strike or disregard that affidavit [or declaration] unless the court determines that the affidavit 'constitutes an attempt to create a sham fact issue.'"  *Id.*  The Court has followed the Sixth Circuit's instruction when reconciling any inconsistencies between Pettway's deposition testimony and his declaration.

policies . . . . Failure to correct one or both incidents will result in suspension up to termination.

(D.N. 40-6, PageID # 568)  In his deposition testimony, Pettway acknowledged these errors and also admitted that he had previously been warned about switching buses and told to follow the schedule.  (D.N. 40-5, PageID # 455, 458)  But, in his subsequent declaration, Pettway maintains that Scott had never spoken to him or verbally counseled him about key log errors before the September 30 write-up.  (D.N. 41-1, PageID # 724)

Scott then called Pettway in for a meeting regarding his write-up.  (*Id.*)  Pettway signed the written warning for his infractions without providing any explanation for the errors.  (*Id.*)  Pettway testified that he did not write his own explanation of events because he "wasn't sure what was going on at that time."  (*Id.*, PageID # 455)  Pettway felt as though the write-up was unfair because "I figured if I was going to get written up, Ms. Wheeler should have [been] written up too."  (*Id.*, PageID # 452)  The night after receiving the September write-up, Pettway again failed to sign in a key for a vehicle returned during his evening shift.  (*Id.*, PageID # 459)

On October 6, 2016, the agency overseeing the civilian subcontractors at Fort Knox announced a need for an "immediate" reduction in dispatcher hours.  (D.N. 40-1, PageID # 374) Rob Deitrich, the Business Manager at LTS, sent an email to Tiffany Berry and Casey Palmer— Regional Operations Managers at LTS—stating that he had attended a meeting and that

> [a]s the conversation progressed [the agency] made it very clear that they want to see immediate staffing changes in reference to Dispatchers.  To make a long story short[,] we were told that dispatchers were not needed to be there between 0500 and midnight, nor did they need to be there on days when there were no bus runs . . . . They made it very clear they expect the changes to take effect immediately . . . .

(D.N. 40-9, PageID # 665)  LSG states that it was initially asked to eliminate several full-time positions, but that it advocated to keep the positions, with partial success.  (D.N. 40-1,

PageID # 375)  While no employees were laid off, a bus driver, a truck driver, and dispatcher position were reduced from full to part-time.  (*Id.*)

LSG stated that Jarret Gonsalves, the highest-ranking LSG employee onsite at Fort Knox, was tasked with deciding which employees would be affected by the mandated reduction.  (*Id.*)  On October 11, 2016, Gonsalves emailed Donna Navarro—Vice President and Director of Human Resources & Finance for LSG—to ask whether the decision should be made "based on seniority and/or performance."  (D.N. 40-9, PageID # 662; D.N. 40-2, PageID # 397)  Navarro responded that it was Gonsalves's choice, and that it "was not up to the [e]mployees when the government directed downsizing[,] [e]specially when the one you keep has not been counseled and the senior person has."  (*Id.*)  LSG states that after Gonsalves was advised that it was appropriate to consider employee performance, "Pettway was chosen for the reduction because he made the most errors and was the lowest performing of the dispatchers."  (D.N. 40-1, PageID # 375)

Pettway testified that Gonsalves and Scott informed him on October 14, 2016, that he was being moved to part-time.  (D.N. 40-5, PageID # 446)  On October 18, 2016, Pettway met with Gonsalves again.  (*Id.*)  According to Pettway, he told Gonsalves at the meeting that he felt he was being "discriminated [against]."  (*Id.*)  Pettway maintains that he was not able to explain "everything" during the meeting because Gonsalves kept interrupting him, saying, "Ms. Scott says your job performance is low."  (*Id.*)  Pettway testified that at the end of the meeting, Gonsalves told him that he should "quit and go fishing."  (*Id.*)  Gonsalves denied this and testified that the decision to place Pettway on part-time status "had nothing to do with his age."  (D.N. 40-7, PageID # 578-79)  Ultimately, three employees in the Transportation Motor Pool section were moved to part-time status: Lee Bishop, an African American man; Roger Holman, a white man; and Pettway.  (*Id.*, PageID # 583)  Gonsalves testified that he could not recall Bishop's age but

that Holman was probably in his forties.  (*Id.*)  Gonsalves acknowledged that only men working under Scott were moved to part-time.  (*Id.*)

LSG maintains that it first received notice of the need to eliminate or reduce positions in October 2016.  (*Id.*; D.N. 40-7, PageID # 579)  Pettway argues, however, that cuts were expected as early as the summer of 2016 when the company was informed that the "Warriors Transition Battalion" was closing.  (D.N. 41, PageID # 705)  In July and August 2016, another LSG employee—Rosie Ashley—overheard several conversations between Kelly Denson and Donnell Scott regarding the expected cuts.  (D.N. 41-2, PageID # 734)  In her declaration, Ashley stated that Denson "was worried about having her hours cut, or losing her job because downsizing was always done by seniority" and Denson was "friendly with [Scott]," with the two often chatting "over personal matters."[3]  (*Id.*)  Ashley then stated that in July 2016, she overheard a phone call in which Denson said "they are closing down WTB soon" and "you need to make sure I have a job," followed by "you need to get rid of him."  (*Id.*)  Ashley says that at the time, she assumed Denson was speaking with Scott "because [Denson] was depending on [Scott] to keep her working full time."  (*Id.*)  Likewise, Ashley said that she overheard Denson and Scott speaking in the dispatch office in August 2016.  (*Id.*)  According to Ashley's declaration, Denson said that she "really needed a job" and told Scott that Scott needed to get rid of Pettway.  (*Id.*)  Scott responded that she was working on it and that the "Old Bastard needs to retire or just quit."  (*Id.*)  Ashley stated

---

[3] Consistent with the discussion above, the Court will consider Ashley's declaration using the Sixth Circuit's instruction that parties cannot create genuine issues of material fact through affidavits or declarations that: (1) are "merely conclusory reiterations of the allegations of the complaint and which are not made on personal knowledge" or (2) "contradict their own depositions."  *Tiller v. 84 Lumber Co.*, 1989 U.S. App. LEXIS 15558, at *10 (6th Cir. Oct. 10, 1989) (internal quotations and citations omitted).  As will be explained in greater detail below, Ashley's declaration creates a genuine issue of material fact.  But, Ashley was not deposed, and her unrebutted declaration statements are not inconsistent with any deposition testimony in the record.  Moreover, LSG does not dispute that Ashley's declaration statements were based on her personal knowledge.

that she then began to notice that Pettway was being targeted.  (*Id.*)  Specifically, Ashley stated in her declaration that she observed Denson gathering up only Pettway's paperwork in the mornings to take to Scott's office.  (*Id.*)  Meanwhile, Ashley noted that Denson's paperwork—which was left behind—"was full of mistakes[] such as forms not being filled out properly, having the wrong date, missing information, or not signed."  (*Id.*)

In her declaration, Ashley said that it was a common occurrence for Scott to refer to Pettway as an "Old Fart" and "Old Bastard" before he filed his discrimination complaint, and that it was done so often that "you knew who she was referring to without her saying his name."  (*Id.*)  According to Ashley's declaration, Scott "would talk about how she could not stand the Old Bastard, that she could not stand looking at him, that he did not need to work, [and that he] did not need the money because he was retired from another job and should just quit and stay home."  (*Id.*)  Ashley went on to characterize Scott's attitude toward older workers as believing that they did not "need to work" and that they could "live on their social security or other retirement."  (*Id.*)  Ashley also claimed that Scott would "often speak to older workers like they were idiots and not capable of understanding or remembering her instructions."  (*Id.*)

Pettway does not deny that he made mistakes.  (D.N. 41, PageID # 709)  Pettway argues, however, that despite the fact that LSG employees commonly make paperwork mistakes, only his mistakes "were recorded and resulted in a write-up and subsequent demotion."  (*Id.*, PageID # 704)  In her declaration, Ashley stated that common employee mistakes included errors in key logs and improperly completed paperwork.  (D.N. 41-2, PageID # 733)  Scott testified that she would have no dispatchers if she wrote up every employee for their mistakes.  (D.N. 40-4, PageID # 420)  Ashley confirmed in her declaration that "[m]istakes in paperwork, by any employee, regardless of their age, are common" but that, to the best of her knowledge, from the time LSG took over the

contract to the time Scott left LSG, "no one other than [Pettway] was ever written up for not signing the key log, errors in paperwork, or bus assignment issues." (D.N. 41-2, PageID # 733) Ashley went on to say that although she personally observed more errors by Denson than Pettway, she was not aware of Denson ever receiving an employee counseling report. (*Id.*) Scott acknowledged that all the employees made mistakes but maintains that Pettway "ma[de] several more that involve[d] . . . a security issue." (D.N. 40-4, PageID # 420) Scott admitted, however, that when Pettway reported the mistakes of other dispatchers, including Denson, Scott told him to "quit sending [her] th[at] stuff." (*Id.*)

Denson admitted that she has accepted dirty vehicles, failed to note damage to vehicles, and made other mistakes which she has been allowed to fix. (D.N. 40-3, PageID # 403) Denson also testified that when she forgets to sign the key log, she is able to correct the error the following morning. (*Id.*) Moreover, Denson said that if one dispatcher noticed that another had not signed, they would inform the other dispatcher and let them fix their own error because "[e]verybody just kind of worked together" and they "[c]orrected mistakes." (*Id.*) Scott stated, however, that if the government saw that employees were not signing key logs, the company could get in serious trouble, and that she told Pettway this many times and "made copies of [the key logs] numerous times where [Pettway] is not signing them." (D.N. 40-4, PageID # 424) Denson testified that Pettway has been known to "not sign in the keys[,]" and she agrees that such an error is a security issue. (D.N. 40-3, PageID # 405) Denson described a situation where a set of keys could not be located only to later discover that Pettway had left them in the car overnight. (*Id.*) On one occasion after Pettway was written up on September 30, however, Denson not only failed to sign the key log but failed to get the key, and the bus driver accidentally took the key home. (*Id.*)

A few weeks after Pettway's hours were reduced, Pettway sent a demand letter alleging discrimination. (D.N. 40-1, PageID # 371) According to LSG, this demand letter was the first notice LSG received that Pettway believed he was being discriminated against. (*Id.*, PageID # 376) LSG claims that Pettway did not make a written or oral complaint to anyone within LSG. (*Id.*) Pettway testified that he met with Casey Palmer on October 13, 2016,[4] because he believed that Palmer was part of LSG. (D.N. 40-5, PageID # 448) Pettway says that he called Ashley to inquire as to the identity of the HR representative, and Ashley responded, "Go see Casey Palmer." (*Id.*) In her declaration, Ashley clarified that she told Pettway to speak with Palmer because there was a community notice board in the break room "that had posters and information on it about discrimination," including a paper listing Palmer "as the next person on post to go to." (D.N. 41-2, PageID # 735) LSG states that "Palmer was not and never has been an LSG employee or manager." (D.N. 40-1, PageID # 376)

Pettway testified that he told Palmer during their October 13, 2016, meeting that he felt he was being discriminated against by Scott. (D.N. 40-5, PageID # 448) Pettway says that he also provided Palmer with examples of Scott's discriminatory conduct. (D.N. 41-1, PageID # 726-27) Pettway testified that Palmer promised that he would look into Pettway's complaints. (D.N. 40-5,

---

[4] It is unclear whether Pettway met with Palmer in 2015, 2016, or 2018. In Pettway's deposition, counsel asked about Pettway's "October 13, 2015" meeting with Palmer. (D.N. 40-5, PageID # 448) In his response to LSG's motion for summary judgment, Pettway writes that he was demoted "on October 14, 2018, the day after [he] reported discrimination." (D.N. 41, PageID # 703) Pettway testified, however, that he was informed of Gonsalves's decision on October 14, 2016. (D.N. 40-5, PageID # 446) Likewise, in Pettway's declaration, he says the meeting occurred on October 13, 2016 (D.N. 41-1, PageID # 726), and that he was told that he was being moved to part-time the following day (*id.*, PageID # 727). Moreover, Palmer's declaration states that he recalls Pettway coming in to his office on two occasions "[i]n late 2016" (D.N. 40-10, PageID # 667), and Deitrich's email stating the need for a reduction in hours was sent on October 6, 2016 (D.N. 40-9, PageID # 665). Based on the above, the Court finds that an October 13, 2016, meeting between Palmer and Pettway is consistent with the undisputed facts and the context provided in the record.

PageID # 453)  Pettway stated in his declaration that he "really thought something would happen" after his meeting with Palmer  (D.N. 41-2, PageID # 727)  In his declaration, Palmer recalls Pettway coming to him on two occasions in 2016.  (D.N. 40-10, PageID # 667)  Palmer noted that LTS and LSG are separate companies, however, and that as a project manager for LTS, he played no role in LSG's human resources matters.  (*Id.*)  Palmer said that he "would not, and did not, tell . . . Pettway that [he] would look into the matter."  (*Id.*)  Gonsalves said that Palmer did not tell him what Palmer had discussed with Pettway.  (D.N. 40-7, PageID # 578)

Pettway received a response to his demand letter from LSG on November 18, 2016. (D.N. 41-1, PageID # 728)  According to Pettway's declaration, in the two following weeks he was only scheduled for a total of 22.6 hours, and then for only 35.1 hours the next two weeks.  (*Id.*) Pettway's payroll report shows that he was not scheduled to work from December 17, 2016, to December 30, 2016 and was not returned to at least 20 hours per week until the week beginning February 11, 2017.  (D.N. 41-6, PageID # 782)  Pettway states that he also should have received two hours of holiday pay in July and September of 2016.  (D.N. 40-5, PageID # 451)  LSG states that Pettway never complained that he was being treated unfairly or that its holiday pay policy was discriminatory.  (D.N. 40-1, PageID # 377)  Pettway admitted that he did not inform anyone at LSG that he felt he was being treated unfairly in either July or September of 2016.  (D.N. 40-5, PageID # 452)

In August 2017, a full-time dispatcher retired.  (D.N. 40-1, PageID # 378) At that time, Pettway was offered and accepted a full-time position. (*Id.*)  He remains in that position today. (*Id.*)  Melissa Fisher—a white female employee in her early forties—testified that Scott provided her with specific errors of Pettway's the following month and directed her to send an email with a report of these errors to Scott.  (D.N. 41-3, PageID # 741-42)  Fisher was also told to copy

Gonsalves on the email. (*Id.*) On September 18, 2017, Fisher sent the requested email to Scott. (D.N. 40-7, PageID # 588) Gonsalves testified that Scott requested this information because they were noting mistakes and errors but no longer counseling Pettway per the directive of LSG. (*Id.*) Fisher testified that the next day, "more mistakes were found, not only on [Pettway] but on other dispatchers also" but Scott asked her to send an email containing only Pettway's errors again. (D.N. 41-3, PageID # 741) According to Fisher, Scott told her that "[i]f other dispatchers make mistakes, [Fisher could] call them into [her] office and talk to them about their errors." (*Id.*)

Fisher stated that she was worried about Scott's request but was afraid of retaliation, saying that although she felt the need to say something, she was worried "[she] would reap the wrath [of Scott]." (*Id.*, PageID # 742) Fisher "question[ed] why only Mr. Pettway's mistakes were being submitted and not the other ones . . . and asked [Gonsalves's] direction on how or what [she] could do to comply with what [Scott] asked [her] to do without making it look like [she] was attacking [Pettway]." (*Id.*) Fisher sent Gonsalves an email, asking: "Why am I being guided by [Scott] to create the emails about Mr. Pettway, so all she has to do is forward them? It looks like I'm only attacking Mr. Pettway when she instructs me to only send his errors instead of including all the errors that are made by all the dispatchers." (D.N. 41-5, PageID # 778) According to Gonsalves, Fisher did not tell him that she thought Pettway was being singled out for write-ups during their meeting. (D.N. 40-7, PageID # 586) Instead, Gonsalves testified that Fisher told him that she was concerned about processes and procedures not being followed—such as paperwork not being properly filled out and keys not being logged—and that it was Pettway in particular who was making such errors. (*Id.*) Gonsalves said that Fisher told him there were "notes of different deficiencies" but that "a number of the deficiencies or the majority of them came from Mr. Pettway." (*Id.*, PageID # 587)

According to LSG, Pettway's job title and pay grade have remained the same throughout his employment, and he has never applied for a promotion or requested a different position. (*Id.*, PageID # 378)  In his declaration, Pettway claims that he was not given the opportunity to apply for a promotion because the position was not posted. (D.N. 41-1, PageID # 724)  Instead, Scott promoted Fisher to lead dispatcher in September 2015. (*Id.*)  As to Pettway's other allegations, LSG states that although Pettway "makes more errors than other dispatchers, he has not received any formal discipline." (D.N. 40-1, PageID # 378)  LSG says that this is in order to ensure that Pettway was "treated fairly in the face of his allegations against the onsite management team." (D.N. 40-1, PageID # 378)  LSG has directed that all discipline of any nature against Pettway must come through its corporate office and that—upon review of performance deficiencies—"all corrections be handled with only verbal counseling." (*Id.*)

Pettway filed this action against LSG in Hardin County Circuit Court, alleging that LSG discriminated against him on the basis of age, race, sex, and perceived disability. (D.N. 1-1, PageID # 17-21)  Pettway also asserted claims of retaliation, outrageous conduct, and negligent supervision. (*Id.*, PageID # 21-23)  At that time, Pettway also filed a complaint with the Equal Employment Opportunity Commission. (*See* D.N. 18-1, PageID # 154)  Thereafter, LSG removed the action to this Court on the basis of diversity jurisdiction. (D.N. 1)  Following removal, Pettway amended his complaint to add Akima, Akima Support Operations, and Wolverine Services as defendants (D.N. 20); his claims against these defendants were later dismissed (D.N. 36).  Pettway also amended his complaint in order to bring new allegations that LSG retaliated against him for filing his complaint in this matter. (D.N. 20, PageID # 202)  LSG now seeks summary judgment as to all of Pettway's claims against it. (D.N. 40)

## II.

Summary judgment is required when the moving party shows, using evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see* 56(c)(1). For purposes of summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, the Court "need consider only the cited materials." Fed. R. Civ. P. 56(c)(3); *see Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 136 (6th Cir. 2014). If the nonmoving party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the fact may be treated as undisputed. Fed. R. Civ. P. 56(e)(2)-(3). To survive a motion for summary judgment, the nonmoving party must establish a genuine issue of material fact with respect to each element of each of his claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (noting that "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial").

In his amended complaint, Pettway asserts claims of age, race, sex, and disability discrimination under the KCRA, Title VII, the Americans with Disabilities Act, and the Age Discrimination in Employment Act (Counts I-VIII). (D.N. 20, PageID # 212-19) Pettway also alleges that LSG retaliated against him in violation of the KCRA and Title VII (Counts IX and X). (*Id.*, PageID # 219-21) Finally, Pettway brings common-law claims against LSG for outrageous conduct and negligent hiring and supervision (Counts XI and XII). (*Id.*, PageID # 223-24)

## A.      Federal Enclave Doctrine

As a preliminary matter, the Court notes that Fort Knox became a federal enclave in 1942. Ky. Rev. Stat. § 3.030; *see also Watkins v. Safety-Kleen Systems, Inc.*, No. CIV A 5:08-CV-224KSF, 2008 WL 4073554, at *6 (E.D. Ky. Aug. 29, 2008); *In re Air Crash Disaster at Gander, Newfoundland on Dec. 12, 1985*, 660 F. Supp. 1202, 1207 n.4 (W.D. Ky. 1987).  Kentucky did not reserve legislative power on Fort Knox.  Ky. Rev. Stat. § 3.030; *see Watkins*, 2008 WL 4073554, at *6.  "Since a State may not legislate with respect to a federal enclave unless it reserved the right to do so when it gave its consent to the purchase by the United States, only state laws existing at the time of the acquisition remain[] enforceable, not subsequent laws."  *Paul v. United States*, 371 U.S. 245, 268 (1963) (citing *James Stewart & Co. v. Sadrakula*, 309 U.S. 94 (1940); *Arlington Hotel Co. v. Fant*, 278 U.S. 439 (1929)).

The Kentucky Civil Rights Act was enacted in 1966, and Kentucky first recognized the tort of outrageous conduct in 1984.  Ky. Rev. Stat. § 344.020; *Craft v. Rice*, 671 S.W.2d 247, 250-51 (Ky. 1984); *Kentucky Farm Bureau Mut. Ins. Co. v. Burton*, 922 S.W.2d 385, 389 (Ky. Ct. App. 1996).  Therefore, if Pettway's alleged injuries occurred on Fort Knox, his KCRA and outrage claims against LSG are barred by the Federal Enclave Doctrine.  *Id.*  Pettway does not dispute Fort Knox's status as a federal enclave or the inapplicability of the KCRA and tort of outrageous conduct to injuries suffered on Fort Knox.  (*See* D.N. 41)  Nor does he appear to contend that his injuries occurred anywhere other than Fort Knox.  (*See id.*)  Pettway's KCRA and outrageous-conduct claims are therefore barred by the Federal Enclave Doctrine, and the Court will only analyze Pettway's discrimination claims under federal law.

**B.     Discrimination**

Pettway alleges that LSG discriminated against him on the basis of age, race, sex, and perceived disability in violation of Title VII, the ADA, and the ADEA.  (D.N. 20, PageID # 212-19)  In his amended complaint, Pettway stated that LSG discriminated against him "on account of [his] ] race and color," that Pettway's age was the but-for cause or a motivating factor in the adverse employment actions, and that LSG "willfully and intentionally discriminated against [Pettway] based on his age."  (*Id.*, PageID # 213-217)  At the start of this litigation, Pettway was a 79-year-old African American male who had been a dispatcher at TMP since June of 2001.  (D.N. 41, PageID # 719)  Pettway argues that "[t]here are two substantially younger white female dispatchers with less seniority that were kept on as full-time dispatchers" while he was reduced to part-time.  (*Id.*)  Pettway also argues that although he had ten years greater seniority than a white female employee, she was promoted to Lead Dispatcher while Pettway was not given the opportunity to apply.  (*Id.*, PageID # 710-11)  Pettway states that he is the only African American dispatcher and that although he "meets the age, race, and sex requirements, [and] is qualified for the position [] much younger white female employees have been treated more favorably."  (*Id.*, PageID # 711)  Pettway may prove discrimination by introducing either direct evidence of discrimination or circumstantial evidence supporting an inference of discrimination.  *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003).

**1.   Age Discrimination**

**i.   Direct Evidence**

Direct evidence "is evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (internal quotations omitted) (quoting *Jacklyn*

*v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 936 (6th Cir. 1999)) It proves the existence of a fact without any inferences. *Burus v. Wellpoint Cos.*, No. 5:08-154-KKC, 2010 U.S. Dist. LEXIS 28798, at *11 (E.D. Ky. Mar. 25, 2010). "Where a plaintiff presents direct evidence of discriminatory intent in connection with the challenged employment action, 'the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination.'" *Johnson*, 319 F.3d at 865 (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2003)).

"[D]irect evidence [of discrimination] does not include stray remarks in the workplace, particularly those made by non-decisionmakers or statements made by decisionmakers unrelated to the decisional process itself." *Steeg v. Vilsack*, No. 5:13-CV-86-TBR, 2016 U.S. Dist. LEXIS 149488, at *3 (W.D. Ky. Oct. 28, 2016) (quoting *Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 96 (1st Cir. 1996)). "Stray remarks are 'general, vague, or ambiguous comments [and] do not constitute direct evidence of discrimination because such remarks require a factfinder to draw further inferences to support a finding of discriminatory animus.'" *Id.* at *4 (quoting *Sharp v. Aker Plant Servs. Grp., Inc.*, 726 F.3d 789, 798 (6th Cir. 2013)). To determine if statements are "relevant" as direct evidence of discrimination or merely "stray remarks," courts generally consider "(1) whether the remarks were made by the decisionmaker or by an agent uninvolved in the challenged decision; (2) whether the remarks were isolated or part of a pattern of biased comments; (3) whether the remarks were made close in time to the challenged decision; and (4) whether the remarks were ambiguous or clearly reflective of discriminatory bias." *Worthy v. Mich. Bell. Tel. Co.*, 472 F. App'x 342, 347 (6th Cir. 2012) (citing *Cooley v. Carmike Cinemas, Inc.*, 24 F.3d 1325, 1330 (6th Cir. 1994); *Dep't of Civil Rights ex rel. Burnside v. Fashion Bug of Detroit*,

702 N.W.2d 154, 157 (Mich. 2005)). Based on the cited materials in the record, Court finds that Pettway has presented direct evidence of age discrimination.

In her declaration, Ashley stated that she overheard Denson tell Scott in August 2016 that she needed to get rid of Pettway, and Scott responded that she was "working on it" and that the "Old Bastard needs to retire or just quit." (D.N. 41-2, PageID # 734) The statement was made close in time to the challenged decision, as Pettway's first written warning—which LSG cited as part of the basis for its decision to reduce Pettway to part-time—occurred the following month on September 30, 2016. (D.N. 40-6, PageID # 568-69) Gonsalves then informed Pettway of his decision to reduce Pettway to part-time two weeks later on October 14, 2016. (D.N. 40-5, PageID # 446) Further, the comment—clearly reflective of discriminatory age bias—was part of a pattern of biased comments reportedly made by Scott. Ashley went on in her declaration to say that Scott called Pettway "Old Fart" or "Old Bastard" so often that "you knew who she was referring to without her saying his name." (D.N. 41-2, PageID # 734) According to Ashley, Scott "would talk about how she could not stand the Old Bastard," and that he "did not need the money because he was retired from another job and should jut quit and stay home." (*Id.*) Ashley explained that Scott had a history of treating older workers "differently" and that she "clearly disliked older males," frequently referring to older employees as "Old Farts and Old Bastards," especially when speaking to "younger white female employees who were closer to [Scott] in age." (*Id.*) Ashley characterized Scott's attitude toward older workers as believing they did not need to work, and instead could live on their social security or other retirement. (*Id.*) In her declaration, Ashley also recalled Scott stating that she wanted to get rid of Pettway and two other men over 65 years of age, calling them "old bastards and saying you cannot depend on them," and commenting on more than one occasion that "they should all just stay home or retire." (*Id.*) Finally, Ashley

stated that Scott would often speak to older workers "like they were idiots and not capable of understanding or remembering her instructions." (*Id.*)  Viewed in the light most favorable to Pettway, this evidence clearly indicates a pattern of biased comments regarding older employees at LSG.

## A.  Cat's Paw

As to the remaining prong, LSG maintains that Gonsalves—not Scott—was the decision-maker (D.N. 40-1, PageID # 375), and Gonsalves testified that he did not discuss moving Pettway to part-time with Scott until after his decision was made (D.N. 40-7, PageID # 579).  When a supervisor with alleged discriminatory animus is not the decision-maker, a plaintiff can still demonstrate discrimination with direct evidence by establishing a "causal nexus' between the ultimate decision-maker's decision to [demote] the plaintiff and the supervisor's discriminatory animus." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 350 (6th Cir. 2012) (quoting *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 677 (6th Cir. 2008)).  One way to establish this nexus is by presenting evidence of "cat's paw" liability.  *Id.* at 351.  To prevail on the cat's paw theory of liability, a plaintiff must show that "[b]y relying on th[e] discriminatory information flow, the ultimate decisionmakers acted as the conduit of [the supervisor's] prejudice—h[er] cat's paw."  *Id.* at 350.  "If a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable . . . ."  *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011).  Therefore, under *Staub*, Scott's discriminatory animus against older workers can be imputed to Gonsalves if Pettway can show that (1) Scott "*intended* . . . to cause an adverse employment action" and (2) Scott's discriminatory action "is a proximate cause of the ultimate employment action."  *Id.*

The intent element is easily satisfied, as Pettway has established a genuine issue of material fact exists as to whether Scott intended that Pettway be demoted or terminated.  Pettway testified that as early as 2013, he overheard Scott tell Denson that she was changing Pettway's schedule in order to see less of him.  (D.N. 40-5, PageID # 466)  Between February and September of 2013, Pettway went from working the 4:30 a.m. to noon shift to working the 3:30 p.m. to midnight shift.  (*Id.*, PageID # 467)  Further, Ashley's declaration stated that she overheard two conversations between Denson and Scott about needing to "get rid of" Pettway.  (D.N. 41-2, PageID # 734)  Based on the evidence above, a reasonable jury could find that Scott intended for Pettway to suffer an adverse employment action and thus has "the scienter required to be liable." *Staub*, 562 U.S. at 419.

The second prong of the *Staub* rule requires Pettway to show the existence of a genuine issue of material fact as to whether Scott's actions were a proximate cause of Pettway's move to part-time.  *Id.* at 420 (explaining that cat's-paw liability attaches when the biased intermediate employee's actions are "a causal factor of the ultimate employment action").  Scott's actions need not be the sole cause of the adverse employment action; "[t]he decisionmaker's exercise of judgment is *also* a proximate cause of the employment decision, but it is common for injuries to have multiple proximate causes." *Id.* at 419 (emphasis in original) (citations omitted).  Sixth Circuit precedent merely requires "proof of a 'causal nexus' between the discrimination and the adverse action, or that the intermediate employee 'influence[] the unbiased decision-maker' to take an adverse action." *Chattman*, 686 F.3d at 352-53  (internal citations omitted).  In *Madden*, the court held that the biased supervisor's "discrimination in what information [she] presented to senior managers" was sufficient evidence from which a reasonable factfinder could find causation. 549 F.3d at 677.  Here, Pettway has presented similar evidence demonstrating that although Scott

knew that other, younger employees made comparable errors, she chose to report only Pettway's errors to upper management.

When Gonsalves sought guidance from upper management as to whether the decision to move an employee to part-time status should be made "based on seniority and/or performance," Navarro responded that it was Gonsalves's choice and that it was not up to the employees, "[e]specially when the one you keep has not been counseled and the senior person has." (D.N. 40-9, PageID # 662)  After Gonsalves was advised that it was proper to consider employee performance, "Pettway was chosen for the reduction because he made the most errors and was the lowest performing of the dispatchers." (D.N. 40-1, PageID # 375)  Thus, viewed in the light most favorable to Pettway, Scott's alleged decision to present only Pettway's errors and performance issues to Gonsalves is sufficient evidence from which a reasonable factfinder could find causation. *Madden*, 549 F.3d at 677.  Because Pettway has presented evidence of Scott's discriminatory animus and offered sufficient proof under the *Staub* rule to create genuine issues of fact as to intent and causation, Scott's discriminatory animus will be imputed to Gonsalves.  *See Chattman*, 686 F.3d at 353.  Accordingly, Scott's comment that she was working on getting rid of Pettway and that the "Old Bastard needs to just retire or quit" is relevant direct evidence of age discrimination. *Worthy*, 472 F. App'x at 347.

## B.  LSG's Burden

When proving a claim through the use of direct evidence, a plaintiff does not have to proceed under the *McDonnell Douglas* burden-shifting framework that applies to circumstantial evidence cases." *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004).  Instead, "the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 523 (6th

Cir. 2007) (citations omitted).  As explained above, LSG maintains that Pettway was moved to part-time status because he made a number of errors and was the "lowest performing" dispatcher. (D.N. 40-1, PageID # 375)  More specifically, LSG states that during Pettway's tenure, he "repeatedly f[ell] short of [the] employer's expectations" by "sleeping on the job," "tak[ing] an hour to complete routine tasks that other dispatchers completed in ten minutes," "disregard[ing] the daily scheduled bus assignments," and regularly failing to correctly complete important forms. (*Id.*, PageID # 373)  As explained below, however, LSG has failed to show that it would have made the same decision to move Pettway to part-time absent Scott's selective reporting.

As explained above, there is evidence that Pettway was singled out for discipline.  Pettway was written up for failing to follow a bus schedule although Wheeler—who failed to leave the schedule for Pettway—was not disciplined.  (D.N. # 41-1, PageID # 723-24)  Ashley observed Denson and Scott singling out Pettway's errors for review, but noted that Denson did not receive any counseling despite making more paperwork errors than Pettway.  (D.N. 41-2, PageID # 733)  Scott admitted that employee errors are so common at LSG that she would have no dispatchers if she wrote up every employee for their mistakes.  (D.N. 40-4, PageID # 420)  Ashley confirmed that paperwork mistakes were common but that "no one other than [Pettway] was ever written up for not signing the key log, errors in paperwork, or bus assignment issues."  (D.N. 41-2, PageID # 733-34)  Scott acknowledged that she told Pettway to stop sending her reports on the mistakes of other dispatchers.  (D.N. 40-4, PageID # 420)  Moreover, the Court has already found evidence that Scott discriminated against Pettway in only reporting his errors and performance issues to upper management. Thus, the majority of the reasons cited by LSG for its decision are potentially tainted by the discriminatory bias of Scott.

Finally, although LSG states that Denson reported Pettway "sleeping on the job" (D.N. 40-1, PageID # 373; D.N. 41, PageID # 708), Pettway denies having fallen asleep at work and maintains that Denson would not have been in a position to see him sleeping because "[Denson] would either be gone when [Pettway] arrived or leave as soon as [he] came in." (D.N. 41-1, PageID # 728)  In sum, LSG has not shown by a preponderance of the evidence that it would have made the same decision to move Pettway to part-time status in the absence of any discriminatory animus. *See Blair*, 505 F.3d at 523.  The Court therefore finds that LSG is not entitled to summary judgment as to Pettway's age discrimination claim.

### ii. Circumstantial Evidence

Even without direct evidence of discrimination, Pettway has presented sufficient circumstantial evidence in order to survive summary judgment.  Circumstantial evidence "is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011) (quoting *Wexler*, 317 F.3d at 570).  Under the *McDonnell Douglas* burden-shifting test, Pettway must first establish a prima facie case of discrimination; LSG must then articulate a legitimate nondiscriminatory reason for his termination; and finally, Pettway must demonstrate that the proffered reason is pretextual.  *White v. Duke Energy Ky., Inc.*, 603 F. App'x 442, 446 (6th Cir. 2015) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

To establish a prima facie case of age discrimination under the ADEA, a plaintiff must come forward with evidence that: (1) he was at least 40 years old at the time of the alleged discrimination; (2) he was subjected to an adverse employment action; (3) he was otherwise qualified for the position; and (4) he was replaced by a younger individual.  *See Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 510-11 (6th Cir. 2004) (citing *Burzynski v. Cohen*, 264 F.3d

611, 622 (6th Cir. 2001); *Block-Victor v. CITG Promotions*, 665 F. Supp. 2d 797, 806 (E.D. Mich. 2009) (citing *Skalka v. Fernald Envir. Restoration Mtg. Corp.*, 178 F.3d 414, 420 (6th Cir. 1999)). If a plaintiff is terminated as part of a work force reduction, the Sixth Circuit "has modified the fourth element to require the plaintiff to provide 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" *Johnson v. Franklin Farmers Coop.*, 378 F. App'x 505, 508 (6th Cir. 2010) (quoting *Geiger v. Tower Auto.*, 579 F.3d 614, 623 (6th Cir. 2009)).  Here, the parties agree that Pettway is a member of a protected class but dispute the remaining three elements.

## A.  Adverse Employment Action

To prevent lawsuits based upon "trivial workplace dissatisfactions," the Sixth Circuit requires that a plaintiff prove the existence of an "adverse employment action" to support a Title VII claim.  *White v. Burlington Northern & Sana Fe Ry.*, 364 F.3d 789, 795 (6th Cir. 2004) (citing *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999)).  "An adverse employment action is a materially adverse change in the terms or conditions of employment."  *White v. Coventry Health & Life Ins. Co.*, No. 3:14-CV-645-CRS, 2015 U.S. Dist. LEXIS 147910, at *19 (W.D. Ky. Nov. 2, 2015) (quoting *Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 625 (6th Cir. 2013)).  Examples include: "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."  *Kuhn*, 709 F.3d at 625.  LSG admits that Pettway's move to part-time for more than a year qualifies but argues that Pettway has not suffered any other materially adverse employment action.[5]  (D.N. 40-1, PageID # 386)  Therefore,

---

[5] LSG contests Pettway's characterization of his lack of hours during the holidays and scheduling issues as adverse employment actions.  (D.N. 40-1, PageID # 386)  But, Pettway does not mention holiday pay or scheduling when arguing his prima facie case for his substantive discrimination

it is undisputed that Pettway suffered an adverse employment action when he was moved from full-time to part-time.

## B. Qualified for Position

Under the third prong of the prima facie case, "a court should focus on a plaintiff's objective qualifications to determine whether he or she is qualified for the relevant job." *Wexler*, 317 F.3d at 575 (citing *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1298 (D.C. Cir. 1998) (en banc) (noting that "courts traditionally treat explanations that rely heavily on subjective considerations with caution" and that "an employer's asserted strong reliance on subjective feelings about the candidates may mask discrimination"). "The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field." *Id.* at 575-76. "Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry[,] and demonstrated possession of the required skills." *Id.* at 576. Pettway "must [also] prove that he was performing his job 'at a level which met his employer's legitimate expectations.'" *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 548 (6th Cir. 1991) (quoting *Huhn v. Koehrig*, 718 F.3d 239, 243 (7th Cir. 1983)). A plaintiff "does not raise a material issue of fact on the question of the quality of his work merely by challenging the judgment of his supervisors." *Id.* at 548-49 (quoting *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990)).

The Sixth Circuit has cautioned that courts must not use the "qualified" element of the prima facie case to heighten the plaintiff's initial burden, however. To ensure that the first two

---

claims. (*See* D.N. 41, PageID # 710-12, 716-17) Accordingly, the Court need not address LSG's arguments as to the holiday pay or scheduling at this juncture.

stages of the *McDonnell Douglas* inquiry remain analytically distinct, Sixth Circuit precedent requires "that the 'qualified' prong of the prima facie case be evaluated in light of the plaintiff's employment record '*prior to* the onset of the events that the employer cites as its reason' for its decision." *Nizami v. Pfizer Inc.*, 107 F. Supp. 2d 791, 801 (E.D. Mich. 2000) (citing *Cline v. Catholic Diocese*, 206 F.3d 651, 662-63 (6th Cir. 1999)) (emphasis in original). Thus, "when assessing whether a plaintiff has met h[is] employer's legitimate expectations at the prima facie stage of a termination case, a court must examine [the] plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff." *Cline*, 206 F.3d at 660-61.

Pettway's education level is unclear. Pettway has the relevant experience for his position: he has worked as a dispatcher at the TMP at Fort Knox since 2001. (D.N. 41-1, PageID # 723) As to Pettway's demonstrated possession of the relevant skills and whether he met the expectations of his employer, LSG maintains that Pettway "made the most errors and was the lowest performing of the dispatchers." (D.N. 40-1, PageID # 371) Specifically, LSG states that Pettway was the only dispatcher to have a written warning over performance and that Pettway "acknowledges other areas where his performance fell below his colleagues," such as being slower than other dispatchers on certain tasks and making "lots of mistakes" under time pressure. (*Id.*, PageID # 395) But these are part of LSG's proffered reason for moving Pettway to part-time, in addition to a mandated reduction in force. (D.N. 40-1, PageID # 394) Under *Cline*, the Court must assess whether Pettway met LSG's reasonable expectations independent of the company's justifications for moving Pettway to part-time status. 206 F.3d at 660-61. Apart from the proffered nondiscriminatory reasons for its decision, however, LSG offers little to show that Pettway was not meeting expectations. LSG merely makes a generalized assertion that "it is at least arguable that Pettway

was not qualified for the position of dispatcher as he was failing to meet LSG's legitimate expectations related to his performance." (D.N. 40-1, PageID # 390) This statement is insufficient on its own, and LSG has provided no other evidence to demonstrate how Pettway failed to meet the company's expectations separate from the reasons it provided for moving him to part-time status. Accordingly, Pettway has satisfied this element of his prima facie case.

## C. Replacement

To satisfy the fourth prong in his claim for age discrimination under the ADEA, Pettway must show that he was replaced by a "substantially" younger individual. *Meads v. Lexington-Fayette Urban Cty. Gov't*, No. 15-5310, 2016 U.S. App. LEXIS 23776, at *14 (6th Cir. Jan. 20, 2016) (citing *Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 510-11 (6th Cir. 2004)). LSG argues that "[w]here, as here, the adverse employment action takes place in the context of a reorganization or reduction in force in which the employee's position is eliminated and not refilled," a modified prima facie case applies because "the employee is not actually replaced." (D.N. 40-1, PageID # 389-90) LSG further contends that the "legal princip[les] and considerations underlying the heightened standard apply equally whether an employee's position is entirely eliminated or his position is merely cut to part-time" and that the key distinction "is whether the employee was replaced or the job (or hours) truly went away." (D.N. 42, PageID # 791) Pettway does not dispute the fact that there was a government-mandated reduction in hours, nor does he present evidence that his responsibilities were not simply redistributed among other existing employees. Instead, Pettway contends that LSG's argument "fails because for the [reduction-in-force] provision to apply, the employee must have been fired and had his position eliminated." (D.N. 41, PageID # 711) Pettway misconstrues the definition of a workforce reduction or reorganization.

A workforce reduction or reorganization "occurs when business considerations cause an employer to eliminate one or more positions within the company." *Barnes v. GenCorp.*, 896 F.3d 1457, 1465 (6th Cir. 1989). The workforce-reduction framework applies when "another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." *Id.* (citing *Sahadi*, 636 F.2d at 1117). Therefore, contrary to Pettway's assertion, an employee need not have been fired and had his position wholly eliminated for the workforce-reduction provision to apply. Here, the record shows that LSG was initially asked to completely eliminate multiple full-time positions as part of a government mandate. (D.N. 40-1, PageID # 374) According to LSG, while it was able to convince the interested parties that layoffs were not required, a bus driver, a truck driver, and a dispatcher position were reduced from full to part-time. (*Id.*, PageID # 375) LSG states that as part of the government mandate, "the dispatch office operational hours and staff were reduced," with the reduction primarily affecting evening hours. (D.N. 42, PageID # 791) LSG maintains that no one was hired to replace Pettway (*id.*), and Pettway provides no evidence to show that an employee has been hired or entirely reassigned to perform his duties. Thus, this is a workforce-reduction situation, and the modified prima facie standard applies. *Cushman-Lagerstrom*, 72 F. App'x at 330.

### 1. Modified Prima Facie Standard

In order to establish a prima facie case of discrimination in a workforce reduction situation, the usual fourth element of the prima facie case is modified and the plaintiff must instead "prove additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Geiger v. Tower Auto.*, 579 F.3d 614, 624 (6th Cir. 2009) (internal quotations and citations omitted). "The guiding principle [in

workforce reduction cases] is that the evidence must be sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff . . . ." *Id.* (quoting *Gragg v. Somerset Tech. Coll.*, 373 F.3d 763, 767-68 (6th Cir. 2004)). As explained above, Pettway does not dispute that LSG was required to reduce hours as part of a government mandate. Pettway must therefore present additional evidence that LSG impermissibly singled him out for demotion.

In support of his age-discrimination claim, Pettway provides the following: Denson expressed concern to Scott regarding the expected cuts "because downsizing was always done by seniority" (D.N. 41-2, PageID # 734), but Pettway was the dispatcher selected for part-time status, despite his seniority (D.N. 40-5, PageID # 446); Wheeler was given authority to assign the buses despite having no dispatch experience (D.N. 40-5, PageID # 453); Scott told Pettway that he had a "tendency to forget" and was "very forgetful," which Pettway interpreted as Scott saying, "You are too old and you forget" (*id.*, PageID # 455); Gonsalves told Pettway that he should "quit and go fishing" (*id.*, PageID # 443); Scott and Denson's conversations about getting rid of him and Scott's statement that the "Old Bastard needs to retire or just quit" (D.N. 41-2, PageID # 734); Ashley's statements about Scott's attitude toward and treatment of older employees and the fact that Scott frequently referred to older males as "Old Farts and Old Bastards" (*id.*); Ashley's recollection that Scott said she wanted to get rid of Pettway and two other male employees, calling them "old bastards" and saying on more than one occasion that "they should all just stay home or retire" (*id.*); Ashley's statement that Scott "would talk about how she could not stand the Old Bastard" when discussing Pettway, and that Scott would also say "that she could not stand looking at him, that he did not need to work, [and that he] did not need the money because he was retired from another job and should just quit and stay home" (*id.*); and the fact that although Denson—a

younger female employee—admitted to committing comparable errors, none of her errors have been reported to upper management (D.N. 40-3, PageID # 403). This additional circumstantial evidence of age discrimination satisfies Pettway's heightened burden in a workforce reduction case. Therefore, Pettway has established his prima facie case of age discrimination.

### 2. Race Discrimination

To establish a prima facie case of race discrimination, Pettway must "present evidence that: (1) he was a member of a protected class"; (2) "he suffered an adverse employment action"; (3) "he was professionally qualified for the position he held at the time of the action"; and (4) "he was either replaced by a person from outside the protected class or was treated differently from similarly situated employees outside the protected class." *Duke Energy*, 603 F. App'x at 446 (citing *Clayton v. Meijer, Inc.*, 281 F.3d 605, 607, 610 (6th Cir. 2002)). As explained above, Pettway has shown that he suffered an adverse employment action and was qualified for his position. Therefore, the Court need only determine whether he was replaced by a person outside the protected class or treated differently from similarly-situated employees. For the reasons explained below, the Court finds that Pettway has shown that he was treated differently from similarly-situated employees outside his protected class.

### A. Similarly Situated

"[I]ndividual disparate treatment . . . cases generally require indirect evidence from which an inference of discriminatory motive may be drawn, namely, comparative evidence demonstrating that the treatment of the plaintiff differs from that accorded to otherwise 'similarly situated' individuals who are not within the plaintiff's protected group." *Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241, 1247 (6th Cir. 1995) (quoting *Shah v. General Electric Co.*, 816 F.2d 264, 268 (6th Cir. 1987) (citations omitted)). To qualify as "similarly situated," the employees identified by a

plaintiff must be similar to the plaintiff "in all of the relevant aspects." *Seay v. TVA*, 339 F.3d 454, 480 (6th Cir. 2003) (internal quotations and citation omitted). "For two employees to be similarly situated in the disciplinary context, it is generally relevant if the individuals with whom the plaintiff seeks to compare his/her treatment have dealt with the same supervisor, have been subject to the same standards[,] and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Grose v. Bank One, N.A.*, No. 06-44-JBC, 2008 U.S. Dist. LEXIS 16654, at *9-*10 (E.D. Ky. Mar. 3, 2008) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 54 F.3d 344, 352 (6th Cir. 1998)) (internal quotations omitted). "It is the discrimination plaintiff's burden to establish that the employee's acts were of comparable seriousness to his or her own infractions." *Warfield v. Lebanon Corr. Inst.*, 181 F.3d 723, 730 (6th Cir. 1999) (internal quotation marks omitted). Therefore, in order to prevail on his race-discrimination claim, Pettway must provide evidence that a similarly situated white employee was treated more favorably. As explained below, the Court finds that there is a genuine issue of material fact as to whether Denson—a similarly situated white dispatcher—was treated more favorably than Pettway.

As evidence of favorable treatment for white employees, Pettway points to two situations where other dispatchers made errors similar to his but did not receive discipline. First, Pettway's declaration stated that a white male dispatcher changed the bus schedule to give a driver a bus without air conditioning but did not receive a warning or a write-up. (D.N. 41-1, PageID # 732) Pettway provided no evidence to show that the white male dispatcher had also made unauthorized changes on more than one occasion, however. Moreover, Pettway admitted that the first time he made unauthorized changes to the schedule, Scott simply explained to him the need to rotate buses "but did not warn [Pettway] or tell him he was going to be written up." (D.N. 41, PageID # 706)

Thus, the evidence does not establish that Pettway and the white male dispatcher were "similarly situated."

Pettway's strongest comparator is another white dispatcher—Denson. Although it is not explicitly stated in the record, Scott appears to be Denson's supervisor as she is the fleet supervisor and Denson is a dispatcher, like Pettway. (D.N. 40-4, PageID # 415) Unlike the white male dispatcher who made an unauthorized bus-schedule change, there is evidence in the record that Denson engaged in the same conduct as Pettway without differentiating or mitigating circumstances which would distinguish her conduct or Scott's treatment of her for it. *See Grose*, 2008 U.S. Dist. LEXIS 16654 at *9-*10. First, after Pettway was written up for failing to properly sign in keys, Denson not only failed to sign the key log but also failed to retrieve the key, allowing the bus driver to accidentally take the key home. (D.N. 40-3, PageID # 403) Scott herself noted that failure to sign in keys is considered a security issue, a serious infraction, and can result in a "cure notice" under LSG's contract. (D.N. 40-4, PageID # 424) Further, in her deposition, Denson responded affirmatively when asked if she has ever made a mistake. (D.N. 40-3, PageID # 420) Ashley stated in her declaration that she personally observed more errors by Denson than Pettway. (D.N. 41-2, PageID # 733) Denson admitted that when she forgets to sign the key log, she simply signs it the next morning, and that employees regularly "correct[ed] the mistakes in the key logs." (D.N. 40-3, PageID # 403) Denson admitted, however, that a failure to sign in keys is a security issue. (*Id.*, PageID # 405) Denson stated that to the best of her knowledge, however, none of her errors have been reported to corporate. (*Id.*, PageID # 403) Scott testified that if the government saw that employees were not signing key logs, the company could get in "serious trouble." (D.N. 40-4, PageID # 424) Nevertheless, Scott admitted that she ignored Pettway's attempts to

report Denson's mistakes while still making copies of key logs containing Pettway's errors.  (*Id.*, PageID # 420, 424).

Based on the evidence in the record, Denson—a fellow dispatcher with similar duties to Pettway—committed numerous errors of comparable seriousness but did not receive discipline for her actions.  Thus, the Court concludes that Denson is a similarly-situated employee outside of the protected class.  *See Grose*, 2008 U.S. Dist. LEXIS 16654, at *9-*10.  Moreover, based on the evidence discussed above, the Court finds that there is a genuine issue of material fact as to whether Denson, a white employee, was treated more favorably than Pettway.  Accordingly, Pettway has established his prima facie case of race discrimination.

### 3.  Reverse Gender Discrimination

As to his gender-discrimination claim, Pettway alleges that women received more favorable treatment than men at LSG.  (D.N. 20, PageID # 215-216, 218)  Pettway argues that he was reduced to part-time while two female dispatchers with less seniority were kept on full-time.  (D.N. 41, PageID # 710)  Pettway also argues that although he had ten years greater seniority, a woman was promoted to Lead Dispatcher while he was not given the opportunity to apply.  (*Id.*, PageID # 710-11)  Pettway has already shown that he was qualified for his position and that he suffered an adverse employment action.  *See supra* Part (B)(1)(ii)(A)-(B).  As to the other two prongs, the first and fourth prongs of the prima facie test are modified for claims of reverse gender discrimination.  *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 569 (citing *Leadbetter v. Gilley*, 385 F.3d 683, 690 (6th Cir. 2004)).  First, instead of membership in a protected class, Pettway "must demonstrate background circumstances [to] support the suspicion that [LSG] is that unusual employer who discriminates against the majority."  *Id.* (first alteration in original) (quoting *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003)).  And for the fourth

prong, he must show that LSG "treated differently employees who were similarly situated but were not members of the protected class." *Id.* (quoting *Sutherland*, 344 F.3d at 614). Therefore, Pettway must show that he was treated differently than a similarly situated employee who did not identify as male. As explained above, Pettway has already demonstrated a genuine issue of material fact as to whether he was treated differently than a similarly situated female employee. *Cf. Malloy v. Potter*, 266 F. App'x 424, 427 (6th Cir. 2008) (finding that the plaintiff's reverse-discrimination claim failed in part because the plaintiff "did not point to any female employees who were similarly situated to him"). Thus, the Court need only determine whether LSG is that "unusual employer who discriminates against the majority." *Simpson*, 359 F. App'x at 569.

Pettway has alleged sufficient background circumstances to support the suspicion that LSG discriminates against male employees. As explained above, Pettway has offered examples of female employees engaging in conduct potentially warranting discipline but receiving a lesser sanction than Pettway or no sanction at all. *Cf. Arendale v. City of Memphis*, 519 F.3d 587, 604 (6th Cir. 2008) (finding that although it was true that the defendant, an African-American officer, had not filed charges of discipline against a non-white officer, that alone was insufficient to show a prima facie case and that the plaintiff needed to show that a minority officer engaged in similarly sanctionable conduct, but received a less severe sanction). As explained above, Scott continued to catalogue Pettway's errors while telling him to "quit sending" her the errors of other employees. (D.N. 40-4, PageID # 424; D.N. 41-2, PageID # 733) Since he returned to full-time status, Pettway is the only male dispatcher. (D.N. 41-1, PageID # 723) Fisher testified that Scott requested that only Pettway's errors be sent in emails to Scott and Gonsalves, and that Scott told Fisher that she could speak to the other dispatchers in person about their errors. (D.N. 40-3, PageID # 741) Further, the three employees in the TMP section who were moved to part-time were all men, and

Gonsalves confirmed that only men under Scott's supervision were moved to part-time. (D.N. 40-7, PageID # 583) As described above, Pettway stated in his declaration that when the opportunity for promotion arose, a female employee was promoted without the position ever being posted. (D.N. 41-1, PageID # 724)

Viewing this evidence in the light most favorable to Pettway, the Court finds that he has raised a genuine issue of material fact as to whether LSG is the "unusual employer" that discriminates against male employees. *Simpson*, 359 F. App'x at 569. Thus, Pettway has established a prima facie case of reverse gender discrimination sufficient to survive summary judgment. *Simpson*, 359 F. App'x at 569.

### 4. Disability Discrimination

As to his federal disability-discrimination claim, Pettway alleges that he "was treated differently because of his age." (D.N. 41, PageID # 716) Specifically, Pettway states that "LSG perceived Pettway as having a disability and engaged in discriminatory treatment of Pettway on that basis" and "perceived Pettway to be disabled and unable to perform major life activities because of his age" in violation of the ADA. (D.N. 20, PageID # 212, 219) "Under the ADA, in the absence of direct evidence of disability discrimination, a plaintiff may seek to establish a prima facie case of discrimination." *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810 (6th Cir. 1999)). To establish a prima facie case of discrimination under the ADA, Pettway must show that "(1) [he] was 'disabled' within the meaning of the Act; (2) [he] was qualified for the position, with or without accommodation; (3) [he] suffered an adverse employment decision with regard to the position in question; and (4) a non-disabled person replaced [him]." *Stearman v. Ferro Coals, Inc.*, No. 3:15-cv-31-DJH-DW, 2017 U.S. Dist. LEXIS 195020, at *16 (W.D. Ky. Nov. 28, 2017) (quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 882 (6th Cir. 1996)). Pettway's

discrimination claim fails for two reasons. First, age is not considered a disability under the ADA. S. Rep. No. 116, 101st Cong., 1st Sess. at 22 (1989) (Senate Committee on Labor and Human Resources); H.R. Rep. No. 485, Part 3, 101st Cong., 2d Sess. at 28 (1990) (House Judiciary Report); 29 C.F.R. App. § 1630.2(h), 76 Fed. Reg. 16,978, 17,007 (2011). Second, Pettway has not satisfied the fourth prong of his prima facie case.

As explained above, this is a workforce-reduction situation and the modified prima facie standard applies. *See supra* Part (B)(1)(ii)(C). As such, Pettway must "provide additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Geiger*, 579 F.3d at 624. Pettway provided that LSG perceived Pettway's age "as a disability, treating him if he was unable to understand, follow or remember simple instructions because of his age" (D.N. 41, PageID # 717); Scott "talked to [Pettway] like [he] was an idiot" and would speak to him in "slow motion like it's hard for [him] to understand" (D.N. 40-5, PageID # 452); Scott told Pettway that he had a "tendency to forget" and that he was "very forgetful," which Pettway interpreted to mean "[y]ou are too old and you forget" (*id.*, PageID # 455); and Scott would "often speak to older workers like they were idiots and not capable of understanding or remembering her instructions" (D.N. 41-2, PageID # 734). As to the first point, briefs are not evidence. *Bormuth v. Cnty. of Jackson*, 870 F.3d 494, 524 (6th Cir. 2017). Moreover, a significant portion of Pettway's "evidence" simply attempts to show that LSG perceived his age as a disability. As explained above, however, age itself is not a recognized disability. Finally, the remainder of the evidence fails to satisfy Pettway's heightened prima facie burden as it does not indicate that LSG or its agents singled out Pettway for discharge due to his perceived disability. *Geiger*, 579 F.3d at 624. Thus, Pettway's disability discrimination claim fails.

## 5. Burden of Production

Pettway has presented sufficient circumstantial evidence to establish a prima facie case of race, gender, and age discrimination. "Once a plaintiff has established his or her prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged employment action. If the employer articulates a legitimate, non-discriminatory reason for its action, the burden shifts to the plaintiff to come forward with admissible evidence showing that the employer's articulate[d] reason is just a pretext for unlawful discrimination." *Walton v. Best Buy Co.*, No. 2:08-cv-15084, 2010 U.S. Dist. LEXIS 83788, at *26 (E.D. Mich. Aug. 17, 2010).

LSG states that it moved Pettway to part-time status because the government mandated that LSG "immediately" reduce overall dispatcher hours, and that Pettway was selected for the reduction out of the three dispatchers due to his lower job performance. (D.N. 40-1, PageID # 393) Specifically, LSG states that "at the direction of human resources, [Gonsalves] decided to make his decision by 'looking at the total employee,' including performance" and selected the dispatcher that "1) had just been written up for making serious errors and made the same error again the very day of the warning[,] and 2) the dispatcher that everyone with knowledge has testified made the most errors." (D.N. 42, PageID # 794) Job performance is a legitimate nondiscriminatory reason for an employment decision. *See Cicero v. Borg-Warner Auto, Inc.*, 280 F.3d 579, 588 (6th Cir. 2002) ("Terminating an employee because he fails to perform satisfactorily is a legitimate and nondiscriminatory reason to end his employment."); *Cunningham v. Humana Ins. Co.*, 2011 U.S. Dist. LEXIS 98372, at *9 (W.D. Ky. Aug. 31, 2011) (finding that "an employee's failure to meet established performance standards . . . is certainly a legitimate business reason for termination"

(citation omitted)). Thus, LSG has satisfied its burden to set forth a legitimate nondiscriminatory reason for its decision to move Pettway to part-time.

### 6. Pretext

Because LSG has articulated a legitimate nondiscriminatory reason for the adverse employment decision, the burden shifts back to Pettway to come forward with evidence showing that LSG's articulated reason was simply a pretext for illegal discrimination. *Walton*, 2010 U.S. Dist. LEXIS 83788, at *26. "To show pretext at the summary judgment stage, 'the plaintiff is required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the adverse employment action], or (3) that they were insufficient to motivate [the adverse employment action].'" *Carter*, 529 F. App'x at 610 (quoting *Manzer v. Diamon Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (emphasis and internal quotation marks omitted)). "Whichever method the plaintiff employs, he always bears the burden of producing 'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him.'" *Luttrell v. Ford Motor Co.*, No. 3:16-cv-762-DJH-CHL, 2018 U.S. Dist. LEXIS 121662, at *23 (W.D. Ky. July 20, 2018) (quoting *Jordan v. Kohl's Dep't Stores, Inc.*, 490 F. App'x 738, 742 (6th Cir. 2012)). "Courts have recognized that in discrimination and retaliation cases, an employer's true motivations are particularly difficult to ascertain . . . ." *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 564 (6th Cir. 2004) (citing *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)). This makes "such factual determinations unsuitable for disposition at the summary judgment stage." *Id.* (citing *Lowe v. City of Monrovia*, 775 F.3d 998, 1009 (9th Cir. 1985) (stating that very little evidence is required to raise a genuine

issue of fact regarding motive and concluding that summary judgment on the merits is ordinarily inappropriate once a prima facie case has been established)).

Pettway first appears to argue that LSG's proffered reason did not motivate his discharge, stating that there is "ample evidence [showing that] performance was not the real reason" LSG moved him to part-time.  (D.N. 41, PageID # 718)  Pettway then immediately states that LSG's proffered reason was "insufficient" and "unreasonable" under the circumstances.  (*Id.*)  For the reasons explained below, the Court finds that LSG's proffered reason was pretextual under the third showing in *Carter*.  529 F. App'x at 610.

### i.  Third Showing

Pettway's strongest argument is under the third showing, which "ordinarily consists of evidence that other employees, particularly employees not in the protected class, were not [demoted] even though they engaged in substantially identical conduct to that which the employer contends motivated its [demotion] of the plaintiff."  *Quinn-Hunt v. Bennett Enters.*, 211 F. App'x 452, 459-60 (6th Cir. 2006) (quoting *Manzer*, 29 F.3d at 1084)).  This third showing means that a showing of insufficiency may overlap with the "similarly situated" prong of the prima facie case. *See Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 676 (6th Cir. 2008) (quoting *Manzer*, 29 F.3d at 1084).  As explained above, Pettway has provided evidence that he was treated differently than Denson, a similarly situated younger white female employee.

Pettway offered evidence showing that Denson did not receive any discipline despite committing similar errors to Pettway, and that Scott rejected Pettway's attempts to report the mistakes of other employees, including Denson.  (D.N. 40-3, PageID # 403-04; D.N. 40-4, PageID # 420, 424; D.N. 41, PageID # 707-08)  Moreover, Ashley confirmed in her declaration that Pettway was singled out for discipline, noting that Pettway was the only employee "written

up for not signing the key log, errors in paperwork, or bus assignment issues" and that Denson would collect only Pettway's paperwork to bring to Scott's office. (D.N. 41-2, PageID # 733-34) Although LSG contends that Ashley did not work in the dispatch department, she would cover dispatch when needed and "fill[ed] in at dispatch on a regular basis." (*Id.*, PageID # 733) Viewing the evidence in the light most favorable to Pettway, a reasonable jury could conclude that other employees were not demoted or disciplined for substantially identical conduct. *Carter*, 529 F. App'x at 610. Thus, Pettway has sufficiently established pretext under the third showing and summary judgment will be denied. *Id.*

## C. Retaliation

In his amended complaint, Pettway alleged that LSG retaliated against him for complaints made to his employer and the Equal Employment Opportunity Commission; the filing of his complaint in this matter; and his "reporting and refusing to drop charges of discrimination." (D.N. 20, PageID # 220-21) Pettway has provided no direct evidence of retaliation. In assessing claims of retaliation based on circumstantial evidence, courts apply the burden-shifting analysis of *McDonnell Douglas*. *Stanley v. Insights Training Gr., LLC*, No. 3:09-cv-231, 2013 U.S. Dist. LEXIS 1428, at *18 (W.D. Ky. Jan. 4, 2013) (citing *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009)). As explained above, Pettway has already established a genuine issue of material fact as to whether LSG's proffered reason for his termination was pretextual. Therefore, the Court need only determine whether Pettway has made a prima facie showing that: (1) he engaged in a protected activity; (2) LSG knew of the protected activity; (3) LSG subsequently took an adverse employment action against him; and (4) "there was a causal connection between [Pettway's] protected activity and the adverse employment action." *Stevens v. St. Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 631 (6th Cir. 2013) (citing *Niswander v. Cincinnati Ins. Co.*, 529

F.3d 714, 720 (6th Cir. 2008); *Brooks v. Lexington-Fayette Urban Cty. Hous. Auth.*, 132 S.W.3d 790, 803 (Ky. 2004)). For the reasons explained below, the Court finds that Pettway has established a prima facie case of retaliation.

### a. Materially Adverse Employment Action

Pettway correctly notes that the definition of "adverse employment action" in the retaliation context is less restrictive than the definition applied to substantive discrimination claims. *See Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014) (noting that the "materially adverse employment action" element of a retaliation claim is "less onerous" to establish than the "adverse employment action" element of a discrimination claim). "The antiretaliation provision, unlike the substantive [antidiscrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 64 (2006)). In the context of retaliation, therefore, a plaintiff need only show that "the employer's actions (are) harmful to the point they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Coventry Health*, 2015 U.S. Dist. LEXIS 147910, at *28 (quoting *Burlington Northern*, 548 U.S. at 57).

The Court has already determined that Pettway suffered an adverse employment action under the stricter standard when he was moved to part-time status on October 14, 2016. *See supra* Part (B)(b)(i)(1). Pettway also claims that his "material drop" in hours after November 18, 2016, and the singular reporting of his errors also constitute adverse employment actions in the retaliation context. (D.N. 41, PageID # 714-16) The reduction in hours is an adverse employment action separate and distinct from Pettway's move to part-time because—as will be explained below—it occurred in close proximity to Pettway's demand letter, more than a month after his move to part-time. (*Id.*, PageID # 714) Reducing an employee's hours to a significant degree could dissuade a

reasonable worker from pursuing a charge of discrimination. *See Arnold v. Cincinnati Sportservice, Inc.*, No. 1:12-CV-460, 2013 U.S. Dist. LEXIS 99011, at *31 (S.D. Ohio July 16, 2013) (finding that a reduction in hours "caused a material decrease in [the plaintiff's] wages which constitutes an adverse employment action" in the retaliation context); *see also Eure v. Sage Corp.*, 61 F. Supp. 3d 651, 666 (W.D. Tx. 2014) ("Because a reduction in hours—and, consequently, the reduction in associated income—could dissuade a reasonable employee from making or supporting a charge of discrimination, a reduction in hours can be an adverse employment action in the retaliation context." (citations omitted)).    Thus, Pettway suffered from a distinct adverse employment action when his hours were reduced after November 18, 2016. *See Coventry Health*, 2015 U.S. Dist. LEXIS 147910, at *28.

Scott's request that Fisher send a report of only Pettway's errors is also an adverse employment action in the retaliation context.  It is reasonable to assume that employees could be dissuaded from making their own complaint or supporting another employee's claims after observing that only Pettway's errors were singled out for reporting to upper management after filing the present lawsuit.  For example, Fisher was dissuaded from reporting Scott's actions after seeing Scott's behavior toward Pettway.  Scott told Fisher to send her a report which included only Pettway's errors.  (D.N. 41-3, PageID # 741-42)  Although Fisher questioned why Scott requested that only Pettway's mistakes be submitted, she was wary of bringing the issue to Scott because Scott was "vindictive."  (*Id.*, PageID # 742, 751)  Fisher testified that it was her concern that Scott was "going to try and prove that [she was] not needed in [her] position" if she reported Scott's actions.  (*Id.*, PageID # 751)  Therefore, as it could reasonably dissuade other employees from also engaging in protected activity, singling out an employee's errors for reporting to upper

management constitutes an adverse employment action in the retaliation context. *Coventry Health*, 2015 U.S. Dist. LEXIS 147910, at *28.

### b. Protected Activity

"Title VII generally prohibits retaliatory conduct when an employee has participated in an investigation, hearing, or proceeding under Title VII, or when an employee has otherwise opposed discrimination made unlawful under Title VII." *Armstrong v. Whirlpool Corp.*, 363 F. App'x 317, 331 (6th Cir. 2010) (citing *Niswander*, 529 F.3d at 719-20). "The opposition clause protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices." *Laster*, 746 F.3d at 730. It "encompasses utilizing formal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Simmons v. A.I.M.C.O. Prop. Mgmt.*, No. 1:08 CV 0513, 2008 U.S. Dist. LEXIS 32587, at *13 (N.D. Ohio Apr. 21, 2008) (citing *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998)). "Complaints cannot be "[v]ague charges of discrimination or that 'management is out to get the plaintiff,'" however. *Love v. Elec. Power Bd. of Chattanooga, EPB*, 392 F. App'x 405, 409 (6th Cir. 2010). LSG does not appear to contest that Pettway's demand letter, his complaint to the EEOC, and this present lawsuit constitute protected activities. (*See* D.N. 40-1; D.N. 42) The Court finds that such actions constitute protected activities. *See Armstrong*, 363 F. App'x at 331; *Laster*, 746 F.3d at 730.

LSG argues, however, that Pettway's "[c]omplaints of unfair treatment are not protected activity because they lack a specific complaint of age, race, or gender discrimination"; that Pettway never made a written or oral complaint of discrimination to LSG; and that even if Pettway's complaints to Palmer constituted complaints to LSG, "general complaints about company

management and one's own negative performance evaluation . . . do not suffice."  (D.N. 40-1, PageID # 384-85)  LSG maintains that "Pettway never took any of his concerns about Scott to LSG before the decision to move him to part-time was made."  (D.N. 42, PageID # 794)  Viewing the evidence in the light most favorable to Pettway, however, the opposition clause protects his complaints to Casey Palmer about Scott's unlawful harassment.  *New Breed Logistics*, 783 F.3d at 1067-68 ("A demand that a supervisor cease his/her harassing conduct constitutes protected activity covered by Title VII.").

The language of the opposition clause does not specify to whom protected activity must be directed.  *Warren v. Ohio Dep't of Pub. Safety*, 24 F. App'x 259, 265 (6th Cir. 2001) (explaining that under the opposition clause, there is "no qualification" as to who the individual doing the complaining must be or to whom the complaint must be made); *see also New Breed Logistics*, 783 F.3d at 1068 (citing *Ross v. Baldwin Cty. Bd. of Ed.*, No. 06-275, at *6 (S.D. Ala. Mar. 24, 2008) ("It would be anomalous, and would undermine the fundamental purpose of the statute, if Title VII's protection from retaliation were triggered only if the employee complained to some particular official designated by the employer.").  Here, Pettway testified that he brought forward complaints of Scott's discriminatory conduct.  (D.N. 40-5, PageID # 448)  Pettway said that he consulted Ashley because he did not know the identity of LSG's HR representative.  (*Id.*)  Pettway testified that Ashley told him to speak with Palmer, the prime contractor's project manager.  (*Id.*)  In her declaration, Ashley confirmed that she told Pettway to speak with Palmer because there was a community notice board in the break room "that had posters and information on it about discrimination," including a paper that listed Palmer "as the next person on post to go to." (D.N. 41-2, PageID # 735)

Pettway stated in both his deposition and his declaration that he met with Palmer because he believed Palmer was an officer of LSG and would be able to help him. (D.N. 40-5, PageID # 448; D.N. 41-2, PageID # 735) Pettway met with Palmer on October 13, 2016 and states that he told Palmer at the meeting that he felt he was being discriminated against. (D.N. 40-5, PageID # 448) Pettway testified that he explained to Palmer that no matter what he did, he felt targeted and that everything he did was wrong. (*Id.*) In his declaration, Palmer states that he advised Pettway that he would need to address his concerns to LSG. (D.N. 40-10, PageID # 667) Pettway testified, however, that Palmer did not tell him to go to LSG upper management, and instead told Pettway "You're not talking to deaf ears. I will check this out. I will look into it." (D.N. 40-5, PageID # 453) In his declaration, Pettway claims that he provided significant details as to age, race, and sex discrimination during his meeting with Palmer (*see* D.N. 41-1, PageID # 726-27), "leaving no doubt discrimination on these grounds was being alleged and leaving . . . Pettway with the belief that something was going to be done about his report" (D.N. 41, PageID # 713). As there is evidence that Pettway brought his complaints to Palmer in order to end Scott's discriminatory conduct, a genuine issue of material fact exists as to whether Pettway's complaints to Palmer are protected under the opposition clause. *See New Breed Logistics*, 783 F.3d at 1067-68 ("If an employee demands that his/her supervisor stop engaging in this unlawful practice—i.e., resists or confronts the supervisor's unlawful harassment—the opposition clause's broad language confers protection to this conduct.").

### c. Knowledge of Protected Activity

In order to satisfy the knowledge prong of his prima facie retaliation case, Pettway must produce evidence sufficient to establish that the individuals who took the adverse employment action knew of his protected activity. *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002). In

making this determination, the Court considers the knowledge and motive of those who were meaningfully involved in or influenced the [adverse employment] decision. *See Wells v. New Cherokee Corp.*, 58 F.3d 233, 238 (6th Cir. 1995) ("[C]ourts must consider as probative evidence any statements made by those individuals who are in fact meaningfully involved in the decision to [demote] an employee."). Here, those individuals are Gonsalves and Scott. Where "the decisionmaker denies having knowledge of the alleged protected activity, the plaintiff must do more than 'offer[] only conspiratorial theories . . . or flights of fancy, speculations, hunches, intuitions, or rumors.'" *Proffitt v. Metro Gov't of Nashville & Davidson Cty., Tenn.*, 150 F. App'x 439, 443 (6th Cir. 2005) (quoting *Mulhall*, 287 F.3d at 552 (internal quotation marks omitted)).

"An employee may survive summary judgment by producing either direct or circumstantial evidence to establish th[e] [knowledge] element of h[is] claim." *Lewis-Smith v. W. Ky. Univ.*, 85 F. Supp. 3d 885, 909 (W.D. Ky. 2015) (citing *Proffitt*, 150 F. App'x at 442-43). The Sixth Circuit has inferred knowledge of a protected activity in situations where the decisionmaker "took an action with respect to the plaintiff, other than the challenged adverse action, from which it could be inferred that the [decisionmaker] was aware of the plaintiff's protected activity." *Mulhall*, 287 F.3d at 552-53. Further, a decisionmaker's "knowledge of a plaintiff's protected activity can be inferred from evidence of the prior interaction of individuals with such knowledge and those taking the adverse employment action." *Id.* at 553. "A reasonable jury could make this inference when the plaintiff produces evidence that such prior interactions make it 'highly improbable' that the individual who knew of the plaintiff's protected activity did not share this information with the second individual who actually took the adverse employment action as soon as the first individual obtained the information." *Garrett v. Mercedes-Benz Fin. Servs., USA LLC*, 331 F. Supp. 3d 699, 715 (E.D. Mich. 2018) (citing *Mulhall*, 287 F.3d at 553 (citation omitted)). LSG does not appear

to dispute having knowledge of Pettway's lawsuit, demand letter, or complaint to the EEOC. (*See* D.N. 40-1; D.N. 41, PageID # 714) Pettway provides no direct evidence that LSG knew of his complaints to Palmer prior to the decision to move Pettway to part-time, however. The Court thus need only determine whether there is circumstantial evidence sufficient to establish that LSG knew of Pettway's complaints to Palmer. Pettway has failed to produce such evidence.

According to Gonsalves, Palmer did not disclose what Pettway said during their meeting. (D.N. 40-7, PageID # 578) Palmer acknowledged that LTS and LSG are separate companies and that he played no role in LSG's human-resource matters. (D.N. 40-10, PageID # 667) Pettway has provided no evidence of a prior interaction between Palmer and either Scott or Gonsalves from which the Court could infer knowledge of Pettway's October 13, 2016 complaint. *Cf. Hicks v. SSP Am. Inc.*, 490 F. App'x 781, 785 (6th Cir. 2012) (imputing knowledge where the supervisor who made the decision to terminate the plaintiff was friends with two supervisors, one of whom was the plaintiff's direct supervisor who "remembered seeing" plaintiff's charges of discrimination, and the other was the individual who had informed the plaintiff's direct supervisor that the plaintiff was filing for discrimination). Nor has Pettway provided evidence that anyone at LSG took any other action from which the Court could infer knowledge beyond those challenged as adverse employment actions. Pettway's claim that he suffered adverse employment actions for making protected complaints to Palmer therefore fails. *Mulhall*, 287 F.3d at 552. However, because LSG does not contest that it had knowledge of Pettway's demand letter, lawsuit, and EEOC complaint, the knowledge element of his prima facie case is met as to those protected activities.

### d. Causal Connection

For the fourth prong, Pettway must show a causal connection between the protected activity and the adverse employment action. *Scott v. Metro. Health Corp.*, 234 F. App'x 341, 347 (6th Cir. 2007) (citing *Balmer v. HCA, Inc.*, 423 F.3d 606, 613-14 (6th Cir. 2005)). As explained above, the Court has found that Pettway has failed to provide sufficient evidence that Gonsalves or Scott had knowledge of his complaints to Palmer prior to the decision to move him to part-time. Therefore, the Court need only determine whether there was a causal connection between the adverse employment actions and the demand letter, the EEOC complaint, and the present lawsuit.

To establish the requisite causal connection, Pettway "must produce sufficient evidence 'from which an inference could be drawn that the adverse action would not have been taken had' [Pettway] not engaged in protected activity." *Wilkey v. Mgmt. & Training Corp.*, No. 4:15-CV-101-JHM, 2017 U.S. Dist. LEXIS 124155, at *7-*8 (W.D. Ky. Aug. 7, 2017) (citing *Nguyen*, 229 F.2d at 563; *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). This requires proof that the unlawful retaliation would not have occurred absent the alleged wrongful action of the employer. *Id.* "Causation can be proven indirectly through circumstantial evidence such as suspicious timing." *Lindsay v. Yates*, 578 F.3d 407, 418 (6th Cir. 2009) (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 524-25 (6th Cir. 2008)). Specifically, the Sixth Circuit has found that temporal proximity between an assertion of Title VII rights and a "materially adverse action is sufficient to establish the causal connection element of a retaliation claim '[w]here an adverse employment action occurs *very close* in time after an employer learns of a protected activity.'" *Id.* But, "the more time that elapses between the protected activity and the adverse employment action, the more the plaintiff must supplement his claim with other evidence of retaliatory conduct to

establish causality." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (internal quotations and citation omitted).

### i. Material Drop in Hours

The Sixth Circuit has found sufficient evidence of causal connection where the time between the employee's protected activity and the employer's adverse action was three months or less. *See e.g.*, *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 306 (6th Cir. 2012) (finding two months to be sufficient to show a causal connection); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (stating that three months was "significant enough to constitute sufficient evidence of a causal connection"). Pettway was reduced to part-time on October 14, 2016, effective immediately. (D.N. 41-1, PageID # 727) Pettway received LSG's response to his demand letter on November 18, 2016. (*Id.*, PageID # 728) In the two pay periods immediately following Pettway's move to part-time, but prior to LSG's response to his demand letter, Pettway was scheduled for 45.90 and 48 hours, respectively. (D.N. 41-6, PageID # 782) This averages out to approximately 23.48 hours per week.

In the two pay periods immediately following LSG's response to Pettway's demand letter, however, Pettway was only scheduled for a total of 22.6 and 35.10 hours, respectively. (*Id.*) This averages out to only about 14.43 hours per week. Then, from December 17, 2016, to December 30, 2016, Pettway was scheduled for zero hours. (*Id.*) LSG—through Scott—claimed that this was due to a regularly scheduled shutdown that affected the evening shift that Pettway worked. (D.N. 40-4, PageID # 422; D.N. 41-1, PageID # 714) Even taking this as true, Pettway was only scheduled to work 27.40 hours for the period from December 31, 2016, to January 13, 2017, after the holiday shutdown ended. (D.N. 41-6, PageID # 782) This again averages out to only 13.7 hours per week. It was not until the pay period from February 11, 2017, to February 24, 2017, that

Pettway was returned to the part-time hours originally afforded him before November 18, 2016. (*Id.*)

Pettway's demand letter, addressed to LSG by way of Palmer, was dated November 4, 2016. (D.N. 40-5, PageID # 507) It is unclear when LSG became aware of the demand letter because, as explained above, Palmer is not technically an employee of LSG. Logically, however, LSG became aware of the demand letter at some point between November 4, 2016, and Pettway receiving LSG's response on November 18, 2016. Pettway's hours were significantly reduced within a month of sending the letter. While LSG might argue that this reduction in hours was because of Pettway's move to part-time, Pettway's payroll records show that his hours were not reduced to such a significant degree until after November 18, 2016, even though his demotion became effective immediately. (D.N. 41-6, PageID # 782) Based on the above, Pettway has presented sufficient facts to establish a causal connection between his demand letter and the subsequent "material drop" in his scheduled hours. *See Herrera v. Churchill McGee, LLC*, 545 F. App'x 499, 501 (6th Cir. 2013) (holding that temporal proximity of one month between the plaintiff's protected activity and adverse employment action was sufficient to establish a causal connection); *Shefferly v. Health Alliance Plan of Mich.*, 94 F. App'x 275, 285 (6th Cir. 2004) ("[T]he passage of less than three weeks between [the employer's] receipt of charges and the adverse actions gives rise to an inference of discrimination"); *DiCarlo*, 358 F.3d at 421-22 (holding that the passage of only twenty-one days between the plaintiff's filing of an EEOC charge and his termination gave rise to an inference of a causal connection between the two events sufficient to establish a prima facie case of retaliation).

### ii. Singling Out Errors

Temporal proximity is insufficient to establish a causal connection between the singling out of Pettway's errors for review and a protected activity, however. As explained above, LSG responded to Pettway's demand letter in November 2016. (D.N. 40-5, PageID # 507; D.N. 41-1, PageID # 728) Pettway filed the present lawsuit on January 17, 2017 (D.N. 1-1, PageID # 6-7), and filed a charge of discrimination with the EEOC on January 30, 2017 (D.N. 40-5, PageID # 510). It was not until September 2017 that Scott gave Fisher a list of Pettway's errors and directed her to email the errors to Scott and Gonsalves. (D.N. 40-7, PageID # 588, D.N. 41-3, PageID # 741-42) This is a gap of more than seven months between the last of Pettway's protected activities and Scott's directive to Fisher. Under these circumstances, temporal proximity alone is insufficient to establish a causal connection. *See Blessing v. Ohio Univ.*, No. 2:09-CV-0762, 2011 U.S. Dist. LEXIS 140182, at *64 (S.D. Ohio Dec. 6, 2011) ("A one- to- three month time lapse has been held sufficiently close to support a finding that a causal connection exists, but 'proximity alone will not suffice where the adverse action occurs more than a few months . . . after the protected conduct." (quoting *Hamilton v. Starcom Mediavest Gr.*, 522 F.3d 623, 629 (2008)).

There is a genuine issue of material fact, however, as to whether Pettway's errors would have been singled out for review "but for" his filing of the present lawsuit. As explained above, Scott asked Fisher to email her and Gonsalves a report of only Pettway's errors. (D.N. 41-3, PageID # 741-42) This occurred the month after Pettway was returned to full-time. (D.N. 40-1, PageID # 378; D.N. 41-3, PageID # 741-42) Fisher noted that other dispatchers made errors as well, and Scott informed Fisher that she could meet with those dispatchers to discuss their errors. (D.N. 41-3, PageID # 741) Scott told Fisher that she could not do the same with Pettway, however. (*Id.*) Gonsalves testified that they requested this information from Fisher because they were noting

Pettway's mistakes and errors but no longer counseling him per the instruction of LSG.  (D.N. 40-7, PageID # 588)  LSG confirmed that it has directed that all discipline of any nature against Pettway should come through LSG's corporate office and that all corrections be handled only with verbal counseling.  (D.N. 40-1, PageID # 378)  LSG explicitly states that such actions were taken to ensure that Pettway was "treated fairly *in the face of his allegations* against the onsite management team."  (*Id.*) (italics added)  Therefore, the Court need only take LSG at its word to find a but-for causal connection between the singling out of Pettway's errors and his protected activity in engaging in this lawsuit.  The Court thus finds that summary judgment on the retaliation claim is not warranted.

## D.     Negligent Hiring and Supervision

In his amended complaint, Pettway alleges that LSG was required to exercise reasonable care in hiring and supervising the actions of its managers, supervisors, and employees.  (D.N. 20, PageID # 223-24)  LSG argues that Pettway's negligent hiring and supervision claims are preempted by the Kentucky Workers Compensation Act.  (D.N. 41-1, PageID # 380)  Pettway does not address his negligent hiring and supervision claim in his reply.  (*See* D.N. 41)

Under the KWCA's exclusivity provision, "[i]f an employer secures payment of compensation as required by [the KWCA], the liability of such employer shall be exclusive and in place of all other liability of such employer to the employee."  Ky. Rev. Stat. § 342.690.  When a plaintiff asserts "any theories of liability based on negligence [asserted by an employee against an employer], for example negligent hiring . . . [or] negligent supervision . . . , relief is limited to workers' compensation by the exclusive remedy of KRS 342.690(1)."  *Tucker v City of Princeton*, 2010 U.S. Dist. LEXIS 69502, at *31-*32 (W.D. Ky. July 13, 2010) (citing *Estes v. Carpenter Co.*, No. 2003-CA-90-MR and No. 2003-CA-190-MR, 2004 Ky. App. Unpub. LEXIS 2, at *7

(Ky. Ct. App. Nov. 19, 2004) (citations omitted)).  Pettway does not contest that the KWCA applies to his claim against LSG.  Pettway makes no arguments as to his negligent supervision and hiring claims and no argument as to the injuries suffered.  (*See* D.N. 41)  Even if the Court were to assume the same injuries that Pettway previously alleged against the now dismissed defendants, the Court finds that Pettway's negligent hiring and supervision claims against LSG are "likewise preempted by the KWCA notwithstanding Pettway's allegations of some non-physical injuries."  (D.N. 36, PageID # 364)  Thus, the Court finds that Pettway's claims for negligent supervision and hiring against LSG are barred by the KWCA.

## III.

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1)　　LSG's motion for summary judgment (D.N. 40) is **GRANTED** as to Counts I, II, III, IV, VIII, X, XI, and XII of the amended complaint.  The claims asserted in those counts are **DISMISSED**.  The motion is **DENIED** as to Counts V, VI, VII, and IX.

(2)　　This matter is referred to Magistrate Judge Colin H. Lindsay for a status conference and all other purposes consistent with the original referral.  (*See* D.N. 6)